Filed 4/29/22  In re Z.T. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.T. et al., <br><br> Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.T., <br><br> Defendant and Appellant. | A163190 <br><br> (Contra Costa County Super. Ct. Nos. J21-00028, J21-00029, J21-00030) |

C.T. (Father) appeals from juvenile court orders finding jurisdiction over his three minor children under Welfare and Institutions Code section 300, subdivision (b)(1) ("section 300(b)(1)")[1] and disposition orders requiring he engage in family maintenance services.  Because the juvenile court vacated the dependencies and dismissed his children's dependency petitions during the pendency of this appeal, we dismiss Father's appeal as moot.

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

On January 3, 2021, Father and C.V.T. (Mother) reportedly engaged in a violent physical altercation in the presence of their three children in their family home. The dispute began in the kitchen while Father was holding their then one-year old son C. After the argument ended and Father left the house, Mother called the police.

According to the summary of the police report prepared by Contra Costa County Children and Family Services Bureau ("CFS"), Mother told the responding officer that Father, while holding C., punched the right side of her face and pushed her, causing her to fall backwards into the dining table. To defend herself, Mother began pushing, punching, and slapping Father. The fight moved from the kitchen to the living room, where Father put C. down. There, Father grabbed Mother, pulled her to the floor, and sat atop her pinning her to the ground. He continued to slap and punch her, while she scratched him in an effort to get free. Once Mother told Father she could not breathe, he got off. C.'s older sisters—then 9-year old Z. and then 6-year old J.—were sitting on the living room couch during the entire altercation. Mother told the officer there have been "multiple incidents" but neither she nor Father reported them.

When the responding officer located Father, Father said that Mother wished death on him and cornered him against the kitchen table. He attempted to push her away and slapped her to defend himself. Mother punched him while also hitting C. After they moved to the living room where he put C. down, he grabbed her to prevent her from hitting him further and they both fell to the floor. He pinned her down to prevent her from hitting him, but she struck him 20 to 30 times with her fists and scratched him. He released her once she agreed to calm down. Father stated that his daughters

witnessed the incident, but he told them to go upstairs while he was restraining Mother because he did not want them to see what was happening. He told the officer there have been multiple unreported incidents in the past where Mother hit him.

Z. told the officer she and her sister were in the living room watching television when she heard her parents arguing in the kitchen. She heard something hit the dining table and later saw Mother leaning back against the table while Father stood over her holding C. Z. saw Father swing and slap or punch Mother's face and also witnessed the two of them push and hit each other. When they moved their fight into the living room, Father grabbed Mother, pulled her to the floor, got on top of her, and punched and slapped her repeatedly. J. told the officer that, from the living room, she heard her parents arguing. In the living room, she saw Father slap Mother as he sat on top of her but could provide no more details. Z. also reported seeing her parents hit each other in the past.

Father was arrested based on the officer's belief that he had been the "dominant/primary aggressor in the incident." Mother did not press charges.

The family was referred to CFS, which opened an investigation. On January 6, 2021, a CFS social worker attempted to interview the children at the house but Mother denied access, only allowing a glimpse of the children from the front door. They were properly dressed and appeared to not have any visible marks or injuries. Mother also refused to speak with the social worker stating the children were safe and not at risk of harm or injury. That same day, the social worker reached out by telephone to Father, who also refused to discuss the alleged domestic violence and stated the allegations were false. When the social worker reached out the following week, Mother again declined to participate in an interview citing COVID concerns, and

3

Father engaged in an extended conversation about the investigation process but did not commit to an interview. When the social worker reached out to Mother a third time, Mother declined the interview and reported that the matter had been resolved and that she had sought forgiveness from God and the children. When the social worker contacted Father a third time the same day, he too indicated he would not cooperate and said he felt he was being deceived. Accordingly, CFS was unable to interview the parents or children regarding the alleged domestic violence altercation.

On January 21, 2021, CFS filed three juvenile dependency petitions against both parents pursuant to section 300(b)(1) for each of the children based upon their exposure to domestic violence. In its detention/jurisdiction report filed several days later, CFS expressed concern that Father and Mother "minimize[d] the impact of repeated exposure to violence[,] increasing concern for the children[']s[] physical health and mental suffering due to domestic violence in the home." In CFS's view, "there [was] a substantial risk to the physical health of the children suffering several physical and emotional damage" based on the "ongoing and active safety threats of domestic violence likely to injure the children." Without intervention, CFS believed additional incidents of domestic violence would occur and place the children at risk of harm. CFS requested juvenile court oversight given its inability to interview and fully assess the safety of the children. In an effort to prevent further trauma to the children, CFS did not ask to detain the children from their parents' custody but would reassess placement upon completing a fuller evaluation. Even so, CFS recommended Father voluntarily stay elsewhere during the investigation. CFS also recommended both parents enroll in domestic violence, parenting, and anger management classes.

At the detention hearing, the juvenile court noted that typically in cases with this level of domestic violence, there would have been a request for detention and the children would be removed from the home. It observed the case was made very difficult and raised more concerns for CFS due to "an absolute lack of cooperation by the parents." The court also recognized CFS was "bending over backwards" to work with the family to ensure the children could remain safely in their home. Based on counsels' representations to the court that Father and Mother were now willing to engage with CFS, the court ordered a team decision meeting be completed by the family to discuss their support systems and create a safety plan to ensure the children's safety. It also directed the parents to cooperate with CFS on unannounced visits. The court did not order Father to leave the family home given the difficulty of finding a place in light of COVID concerns and costs but hoped he would abide by the recommendation to stay elsewhere. The court continued the detention hearing until it had more information.

On January 28, 2021, a few days prior to the next hearing, CFS submitted a memorandum to the court with recent developments. Father had apologized for previously resisting CFS's outreach, accepted responsibility for his behavior, and agreed to a safety plan. There had been a family meeting with CFS. The parents acknowledged they had unaddressed issues related to past trauma and their divergent opinions on household responsibilities and priorities. They were under a lot of stress due to COVID shelter-in-place orders, spending more time at home with each other, the challenges of distance learning, and the loss of contact with their church and support network. With CFS's assistance, they created a safety plan which allowed Father to remain in the home as long as the parents agreed to stop arguing and physically fighting and instead to use healthy coping skills when

5

conversations escalated. The parents shared that they had utilized some coping skills effectively and that there had not been any violent incidents at the house. In addition, during an unannounced visit, Z. and J. informed social workers that they saw a significant improvement in their parents' behavior and felt "extremely safe" in the family home. The girls expressed sadness and disappointment about their parents' previous fights. However, Z. shared "things in her home have been better and the family has been praying more, playing games together and they recently went out of the home to eat out."

CFS concluded the update as follows: "[Father and mother] have great insight as to what their issues are and are willing to receive the help they need. They are open to participating in marital counseling, family therapy, and anger management classes in order to help them deal with their anger and avoid resorting to physical violence or property destruction. . . . [They] have agreed to follow up with . . . services and make the necessary changes to be better spouses to each other and better parents to their children. Now that the parents are cooperative . . . the plan will be to continue . . . oversight and make sure the parents follow through with the services [that have been] offered to address the issues that brought them to the attention of [CFS]."

On February 1, 2021, the juvenile court held a "continued detention hearing." CFS confirmed it was not asking the court to detain the children at this time, which the children's counsel supported. Observing that "this case [was] moving in the right direction," the court commended the parents' cooperation and ability to discuss difficult issues and to acknowledge they needed help. It ordered the children remain in parental custody.

On April 5, 2021, CFS filed its disposition report recommending the juvenile court sustain the dependency petition, declare all three children

dependents pursuant to section 300 (b)(1), maintain the children in parental custody, and award Father and Mother family maintenance services which would allow the children to remain in the home under the supervision of CFS. The report explained: "[CFS] is worried that [Father and Mother] will continue to argue with each other and will escalate to physical violence while in the presence of the children and that violence will affect the children's emotional well-being and put them at continued risk of physical harm. [The parties] have been working on identifying the triggers that cause the disagreements and find healthy coping skills to deal with stress to avoid the escalation. [Father and Mother] have great insight regarding their situation and although they said they have eliminated the violence from their lives, they are still missing the internal healing. . . . Although some issues have been resolved, the family continues experiencing new life stressors that are affecting the family functioning. [CFS] acknowledges the hard work the family has been putting in when dealing with an open CFS case and dealing with major milestones in their lives. The children have reported that their parents are following family rules and are arguing less, not cursing as much as before and have incorporated some positive family time. [Father] is actively participating in anger management classes and both [parents] have started parenting classes, however the children have not been assessed or participated in mental health services and the parents have not participated in therapeutic services. [CFS] would like the family to complete all services before the case can be closed. . . . [CFS] is hopeful this family can accomplish the goals and behavioral changes needed to successfully close the case."

Father filed an "answer" to and motion to dismiss the petition, claiming a lack of evidence and fraud in CFS's investigation. He also asked the court

7

to dismiss the proceeding based upon the parents' cooperation with CFS and his engagement in services over the course of six months.

On June 7, 2021, following a contested jurisdiction and disposition hearing, the juvenile court denied Father's motion to dismiss in part, striking some of the allegations in the original petition. It amended and sustained separate allegations for Father and Mother stating each parent had "placed [each] child at substantial risk of physical harm and neglect" based on (a) the parents' January 3rd physical alteration in the presence of the children, in which Father punched Mother repeatedly while holding C. in his arms; (b) Father's January 3rd arrest for battery on spouse and "willful cruelty to child;" and (c) information of prior domestic violence incidents between [Father and Mother] not reported to police. The court further noted: "The gravamen of this case is [domestic violence] and this has been proved by a preponderance that this incident occurred, that both parents were involved, that the children were present and that at least at the initiation of the incident one of the parents was holding [C.]."

As to disposition, the court stated, "I am mainly in agreement with the recommendations for family maintenance. I believe the children should remain in the home. I also think it's appropriate to see how this case is doing in several months." Accordingly, the court ordered the children to remain in their home with the parents under the supervision of CFS. It also directed each parent to engage in an anger management program, general counseling, and parenting education. The court acknowledged the parents had begun to engage with CFS and to participate in services and that family circumstances have calmed down. In the court's view, however, the January 3rd altercation between the parents was not an isolated incident based on reports from

8

various family members indicating prior incidents of violence between the parents. Thus, "appropriate limited court oversight [was] in order."

On August 2, 2021, Father appealed the juvenile court's jurisdiction and disposition order. Mother did not file an appeal.

On December 13, 2021, a week after Father filed his opening brief, the juvenile court conducted a six-month family maintenance status review hearing in which the court determined the children were no longer persons described by section 300. The court vacated the dependencies and dismissed each child's petition.[2]

**DISCUSSION**

Father contends that the juvenile court's jurisdictional findings and orders based on his conduct were not supported by substantial evidence. He also argues the court erred by continuing the dependency jurisdiction once he and Mother acknowledged and addressed the problems giving rise to the dependency proceedings, and it abused its discretion when it ordered him to engage in additional unnecessary and unwarranted family maintenance services. We shall not address his contentions because his appeal is now moot.

Generally, an appellate court will dismiss an appeal as moot when events occur during the appeal that render it impossible for the court to grant effective relief. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60 (*N.S.*).) "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceeding moot." (*In re C.C.*

---

[2]     We grant CFS's request for judicial notice of the juvenile court's certified minute orders with respect to its six-month status review during which the court found Z., J., and C. no longer persons described by section 300 and terminated the dependencies. (See Evid. Code, §§ 452, 459; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1417 [judicially noticing minute order that rendered appellate issue moot].)

9

(2009) 172 Cal.App.4th 1481, 1488 (*C.C.*); see also *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163 ["terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot"].) "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*N.S.*, *supra*, 245 Cal.App.4th at p. 60.) Dismissal for mootness in such circumstances is not automatic but must be decided on a case-by-case basis. (*C.C.*, *supra*, 172 Cal.App.4th at p. 1488.)

"Still a court may exercise its inherent discretion to resolve an issue when there remain 'material questions for the court's determination' [citation], where a 'pending case poses an issue of broad public interest that is likely to recur' [citation], or where 'there is a likelihood of recurrence of the controversy between the same parties or others.' " (*N.S.*, *supra*, 245 Cal.App.4th at p. 59.)

In this case, we can give no effective relief. The juvenile court has vacated the dependency proceedings with respect to Father's children and dismissed their dependency petitions, thus terminating jurisdiction over Z., J., and C. The children remain in Father and Mother's custody without supervision of CFS, and there is nothing in the record or judicially noticed materials indicating Father continues to be subject to any ongoing orders for family maintenance services. As Father identifies no current order from the dependency proceedings adverse to him, and we are not otherwise aware of any from the record, there is no effective relief we can provide Father in his appeal from the jurisdictional findings or orders.

Father contends his appeal is not moot because the court's "erroneous and harmful" findings that he exposed his three children to a substantial risk of serious physical harm within the meaning of section 300(b)(1) "could have

10

'unfavorable consequences' for [him] 'extending beyond termination of dependency jurisdiction' and may prejudicially 'infect' future dependency and /or family law custody proceedings." He claims if the court's findings are allowed to stand, he "may be unjustly labeled as a 'child abuser' in the Child Abuse Central Index (CACI). For these reasons, Father says this court can grant him effective relief and should decide his appeal on the merits.[3] We are not persuaded.

Father's concern that future dependency or family law proceedings will be "infected" if findings are not reversed is speculative. Father does not identify any actual future proceedings and asserts only that the court's findings "*could have*" or "*may*" impact such hypothetical proceedings. (Emphasis added.) Speculation about the possible use of the juvenile court's findings in a future dependency or family law case is an insufficient ground to continue with an appeal of the juvenile court's jurisdictional or dispositional findings and orders once the juvenile court has terminated jurisdiction. (See, e.g., *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493–1495.) There is no reason for us to review jurisdictional findings "on the basis of such speculation or caution" about the theoretical future effects of those findings. (See *N.S.*, *supra*, 245 Cal.App.4th at p. 62 [declining to review juvenile court jurisdictional findings based on "speculation and caution"].)

---

[3]     Several months before he noticed his appeal, the California Supreme Court granted review of an unpublished decision to consider the following questions: "(1) Is an appeal of a juvenile court's jurisdictional finding moot when a parent asserts that he or she has been or will be stigmatized by the finding? (2) Is an appeal of a juvenile court's jurisdictional finding moot when a parent asserts that he or she may be barred from challenging a current or future placement on the Child Abuse Central Index as a result of the finding?" (See *In re D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.] 2021 WL 486159, review granted May 26, 2021, S267429].)

11

Father's concerns about being "unjustly labeled as a 'child abuser' " and included in CACI are tenuous and unavailing.  CACI is a statewide database of substantiated child abuse reports maintained by the California Department of Justice under the Child Abuse and Neglect and Reporting Act (the "Act").  (See Pen. Code, §§ 1164 et seq.)  Under the Act, a county welfare department is required to report to the Department of Justice substantiated cases of known or suspected child abuse or severe neglect.  (Pen. Code, § 11169, subd. (a).)  In addition, a county welfare department is required to provide written notice to any known or suspected child abuser that he or she has been reported to CACI.  (See *id.* § 1169, subd. (c).)  Father has presented no authority that CFS has a reporting duty arising from a juvenile court sustaining a section 300 petition, such as the one sustained in this case.  Nor has Father demonstrated that CFS has referred him to CACI.  The record does not contain any evidence that a referral of Father has been made, or that either parent has been noticed of a CACI referral as required by Penal Code section 11169, subdivision (c).  As such, Father's CACI concerns are also speculative and provide no reason for us to review the juvenile court's findings and orders.

## DISPOSITION

Father's appeal is dismissed as moot.

12

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

*A163190/Contra Costa County Children and Family Services Bureau v. C.T.*